**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC D. DOTSON, | No. C 01-4048 PJH (PR) |
|     Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| vs. | |
| GAIL LEWIS, Warden, | |
|     Respondent. | |

This is a habeas corpus case filed by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court. Petitioner has filed a traverse. The matter is submitted.

**BACKGROUND**

An Alameda County jury convicted petitioner of attempted murder, residential robbery in concert, carjacking, burglary, and shooting at an occupied vehicle. With enhancements for being armed with a deadly weapon, use of a firearm, and infliction of great bodily injury, he was sentenced to prison for thirty-two years. He unsuccessfully appealed his conviction to the California Court of Appeal, which affirmed, and the Supreme Court of California denied his petition for review.

As grounds for habeas relief, petitioner asserts that: (1) His Fifth Amendment and *Miranda* rights were violated when police failed to honor his invocation of his right to counsel; (2) the evidence is insufficient to prove his intent to kill the victim; and (3) his due

process rights were violated when his co-defendant's counsel engaged in misconduct.

The following facts are taken from the California Court of Appeal opinion.

> At about 11 a.m. on December 23, 1995, Kathy Manucal arrived at her condominium in Fremont, opened her garage door with an automatic opener, and pulled her BMW automobile into the garage. She retrieved some luggage from the car's trunk, and then left the garage door open while she went through a door into the condominium's kitchen. She put her purse and keys on the kitchen counter and took the luggage upstairs to unpack.
> While Manucal was upstairs, her doorbell rang; when she opened the door, a black woman she did not know, whom she identified at trial as Tamika Williams, asked if she knew where someone named Victoria or Valeria lived. Manucal said she did not know that person and closed the door. Manucal had an "eerie feeling" about Williams, who had looked over toward the garage while at the front door, and Manucal immediately felt the need to close the outer garage door so she could lock herself into her home.
> She went to the door leading from the kitchen to the garage and opened the door just enough to put her arm through to reach the garage door switch. She saw a man with a white mask at the kitchen door; she tried to fight him off and shut the door, but he was too strong. The man forced the door open further and pressed a gun against Manucal's neck; the gun was in his left hand and she saw from his wrist that he was black. She struggled with him and managed to push his hand up away from her neck. During the struggle, Manucal saw another man who was also wearing a mask standing by the driver's side of her car.
> After she got the gun away from her neck, Manucal heard a bang and the next thing she knew she was lying on the floor, unable to move from the neck down. She realized she had been shot. She heard car doors shut two or three times, heard the engine turn on, and heard her car leaving the garage.

Ex. A at 2-3.

Half an hour later, Manucal's son, Kevin, arrived and found the garage door open and his mother's BMW gone. When he opened the interior garage door into the kitchen, he saw his mother lying on the floor just inside the door; she was bleeding from the head. He called 911. Manucal, who had been shot in the head and finger, was hospitalized for three months. At the time of trial, Manucal still could not walk and her trunk muscles were very weak, despite almost daily physical therapy. *Id.* at 3.

Fremont police sergeant Daniel Pasquale responded to Kevin Manucal's 911 call. Kathy Manucal had a bullet entry wound on the top of her head. He believed the head wound was not a contact wound, but the result of a ricochet. *Id.* at 4.

On the evening of December 23, 1995, police located Manucal's BMW in Stockton.

Stockton police officers arrested petitioner and Murray, who were inside the BMW. During a pat-down search, petitioner said that his "life was over" and that the police had caught him. Among the items police found were a set of keys in petitioner's pocket for a rented teal green van and a .38 revolver under the driver's seat of the BMW, which proved to have fired the two bullets recovered from Manucal's home. *Id.* at 4-5.

In an interview with police, petitioner admitted that he took the revolver. When Manucal opened the door, petitioner, who had never fired the gun before, waved it at her. He panicked and heard the gun explode a couple of times and ran back to the van. *Id.* at 11.

Gina Duncan was a friend of Tamika Williams, one of the co-defendants. On the evening of December 22, 1995, Williams came to Duncan's boyfriend's house and asked Duncan if she wanted to go for a ride. Duncan got inside a bluish colored van; inside were Murray and petitioner. *Id.* at 6.

Murray drove them to a shopping mall. Petitioner said something about a "jack" and Duncan said she wanted to go home because she knew someone was going to get hurt. While the van was in the parking lot, she saw petitioner remove a .38 handgun and two masks from a gym bag. *Id.* at 6.

The next day, the four of them drove to a mall in the van. At the mall, petitioner gave Duncan a credit card with the name Kathy M_____ on it, and Duncan and Williams went into a store. Duncan tried to buy a watch, but the salesperson returned the card and told her the card was inactive. *Id.* at 6-7.

Also admitted was evidence of an incident earlier that day. The court of appeal described it thus:

Arnold Estores/Nandy Palumpon Incident

> At about 2 a.m. on the morning of December 23, 1995, in Fremont, as Nandy Palumpon was driving and Arnold Estores was a passenger in a BMW automobile, Estores noticed they were being tailgated. When they pulled over to let the vehicle pass, the passenger in the vehicle – which Estores saw was a bluish-green van – who was wearing a black ski mask, leaned out and shot several times at the lower part of their car with a rifle-type gun. Palumpon slammed on the brakes and stopped

3

the car; the van stopped in front of them. Estores then saw a figure looking back at them from the driver's side window. Palumpon accelerated quickly past the van, and the van started following them again. When they got into an area with lots of traffic, the van turned around and drove away. They later saw a hole in the front fender of the BMW and a hole in the back fender; a headlight was out and two tires were flat. They reported the incident to police.

Two shell casings found in the rented van were determined to have been fired from the .22 rifle found in Dotson's bedroom. Gunshot residue similar in composition to the shell casings was found on the right front window and right front passenger seat of the van. In Williams's taped statement that was played for the jury, she said that she had been lying in the back of the van, while the van was going down the road, when she heard some shots fired.

*Id.* at 7.

## DISCUSSION

*A. Standard of review*

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2001), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 123 S.Ct. 1029, 1041 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falls under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but

"unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 123 S.Ct. at 1041.

Where there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion, in this case that of the California Court of Appeal. *Yist v. Nunnemaker*, 501 U.S. 797, 801-806 (1991).

*B. Issues Presented*

1. *Edwards* claims

Petitioner contends that the investigating officers failed to honor his invocation of his right to counsel when they asked him to consent to a search. He also contends that they failed to honor his subsequent invocation of his right to stop an interrogation.

A suspect who has expressed a desire to have counsel present during custodial interrogation is not subject to further interrogation by the authorities until counsel is made available to the suspect. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Authorities may continue the interrogation if the accused himself voluntarily initiates further communication, *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983), or if the suspect does not clearly request an attorney, *see Davis v. United States*, 512 U.S. 452, 459-62 (1994) (suspect must unambiguously request counsel; "Maybe I should talk to a lawyer" insufficient).

   a. Consent to Search

Petitioner contends his conviction must be reversed because police violated *Edwards* when they asked him for consent to search his home after he had invoked his

right to counsel.

Petitioner requested that an attorney be present when he talked to Fremont police detectives Jeff Swadener and Ken Bingamen. Ex. A at 8-9. The officers then gave a *Miranda* warning and ceased questioning. *Id.* About thirty minutes later the officers asked for permission to search petitioner's home and the teal minivan, which petitioner gave with the caveat that he be present. *Id.* at 9. No attempt was made to interview him. *Id.* Inside the minivan, detectives found a rental agreement in petitioner's name and a Fremont gas station receipt in the name of Scott Page. *Id.* at 5. When detectives went to petitioner's home, they found a .22 caliber rifle under a mattress in the master bedroom. *Id.*

The request for consent to search was not "interrogation" within the meaning of *Edwards*, so there was no violation. *See United States v. LaGrone*, 43 F.3d 332, 337 (7th Cir. 1994) (request to consent to search not interrogation); *United States v. Hidalgo*, 7 F.3d 1566, 1568 (11th Cir. 1993); *United States v. Rodriguez-Garcia*, 983 F.2d 1563, 1568 (10th Cir.1993) ("[e]very federal circuit court which has addressed the *Miranda* issue presented here has reached the conclusion that a consent to search is not an incriminating statement."); *Cody v. Solem,* 755 F.2d 1323, 1330 (8th Cir. 1985).

In addition, petitioner may be trying to contend that the statement he made in the police car on the way to Fremont, described below, should have been suppressed as being the fruit of the allegedly improper request for consent to search, in the sense that he would not have been in the car if the police had not asked for permission to search. For the reasons set out above, the predicate for this claim -- that the request for consent was improper -- has been rejected, so the conclusion does not follow.

   b. Post-search questioning

After the search the detectives transported petitioner to Fremont. Ex. A at 9.

> During the ride, Dotson spontaneously said, "It wasn't supposed to happen that way." The officers did not respond and Dotson repeated the same statement a number of times. He then added, "All we wanted was the car." Swadener admonished Dotson several times to remain quiet, saying he was in no position to take a statement from him at that time. He also reminded Dotson that he had invoked his right to remain silent and that

6

Swadener could not speak with him.  He added that if Dotson wanted to speak to him, he could do so when they got to the Fremont police station.
    When they arrived at the Fremont police station, Swadener took Dotson to an interview room and asked Dotson if he still wanted to give a statement; Dotson said he did.  Swadener then readvised Dotson of his *Miranda* rights.  Dotson consented to an interview and signed an admonition and waiver form at 7:25 a.m.  During the taped interview, Dotson acknowledged that he had rented the van, that he had driven from Stockton to Fremont with Murray and a woman whose name he did not know, that they had his rifle and Murray's gun in the van, and that they were hoping to scare someone into giving them some money.  Dotson became very emotional when the questioning got close to the point of the robbery and shooting of Manucal.  When Swadener asked what happened after they left the Motel 6 on the morning of December 23, Dotson said, "I was makin' every excuse to go home.  But I'd like to stop now."  Swadener responded, 'Want to compose yourself?"  Dotson again said, "I'd like to stop now."  After a short pause, the detectives continued asking -- and Dotson continued answering -- questions about the events leading up to the shooting of Manucal.  When questioning began to focus on the shooting itself, Dotson again asked to stop the interview:

[Dotson:]  "I'd like to stop now."
(long pause)
[Swadener:]  "Eric, we can stop right here if you want to."
[Dotson:]  "Yes.  Yes.  Stop now. "
[Swadener:]  "OK, there's still a question about who fired the gun.  Never mind."
[Bingaman:]  "You want to stop and leave it at that or do you want to tell us who fired the gun?  Hmm?"
[Dotson:  "Stop, leave it like that."
[Swadener:]  "So up to this point, we know you and Chris are standing in the garage and gunshots go off.  But you don't want to tell us which one of you was puling the trigger?"
[Dotson:]  "Want to stop now please?"
[Swadener:]  "OK.  We will conclude the interview at 7:55, December 24, 1996."

    Shortly thereafter, Swadener took Dotson downstairs to the jail for booking.  Before leaving Dotson in the jail, Swadener reminded Dotson of his name and the fact that he would be upstairs in his office, and said that if Dotson wished to converse further about anything, he could inform jail personnel.  About half and hour later, Swadener was told that Dotson had requested that Swadener come back down to the jail to contact him.  Swadener asked Dotson what he wanted, and Dotson said he wanted to continue speaking with Swadener.  At that point, Dotson was still emotional, but was no longer crying and seemed to have regained his composure.
    During this portion of the interview . . . Dotson admitted that he had taken the revolver and Murray had taken the .22 rifle into the garage.  When Manucal opened the door, Dotson, who had never fired a gun before, waved the gun at her.  He panicked and heard the gun "explode" a couple of times; he then ran back to the van.  Murray drove the van and the woman drove Manucal's BMW back to Stockton.

Ex. A at 9-11.

The California Court of Appeal analyzed the events at the police station as two requests to stop the questioning, the first when Swadener asked if petitioner wanted to compose himself, and the second in the quoted portion of the interview above.

Petitioner became emotional when he reached the point of discussing the shooting of Manucal. *Id.* at 15. It was at this point that he first asked to stop. *Id.* The interview paused, with the tape running, while he composed himself. *Id.* He then continued for a bit. *Id.* The trial court found that this request to stop was caused by his loss of composure, "that the request was caused by Dotson's loss of composure and was essentially a request for an intermission, which detective Swadener provided and which allowed petitioner to regain his composure and continue talking., at least temporarily." *Id.* The court of appeal concluded that the evidence was sufficient to support the trial court's finding the request to stop did not amount to an invocation of petitioner's right to stop interrogation. *Id.* at 15. This finding of fact was not an unreasonable determination of the facts as presented in the state court.

The second series of requests to stop interrogation occurred after petitioner composed himself and resumed answering questions about the events leading up to the shooting of Manucal. As the court of appeal said, the "police may well have been excessive in their attempts to continue questioning Dotson . . . ." *Id.* But their efforts were unsuccessful; petitioner said nothing more.

Swadener then took petitioner downstairs to the jail for booking. Before leaving, the officer told petitioner his name and said that if petitioner had any further desire to talk to him, he should inform jail personnel. A half hour later, Swadener was informed that petitioner had requested that Swadener contact petitioner. Petitioner was still emotional, but was no longer crying and seemed to have regained his composure. The interview resumed about thirty minutes after that, and petitioner made incriminating statements regarding his involvement in the crime.

The California Court of Appeal concluded that petitioner had sufficient time to reflect,

outside the presence of the detectives, on whether he wanted to continue talking to them, so that his request to resume the interview was not tainted by the detectives' earlier failure to immediately cease the interrogation when asked to stop. *Id.*

Although the officers may well have violated petitioner's *Edwards* rights when they pressed him to say who had pulled the trigger after he asked to stop, petitioner did not answer, so there was no evidence to be suppressed as to that incident. The only remaining question, then, is whether the officers' failure to honor petitioner's request to stop carried over to the renewed questioning after petitioner had been booked.

After a suspect invokes his *Edwards* rights, authorities may nevertheless interrogate him if the accused himself voluntarily initiates further communication. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983). It is clear that petitioner did so here; he initiated the renewed contact by asking to talk to the officer, and had a total of an hour between the end of the first interview session and the beginning of the second, time in which not only to compose himself but also to reflect on whether he wanted to talk to the police without a lawyer present.

The California appellate courts' rejection of his claim was not contrary to, nor an unreasonable application of, clearly established United States Supreme Court authority.

2. Sufficiency of the evidence

Petitioner asserts that there was insufficient evidence to prove specific intent to kill Manucal. He contends that he did not try to shoot Manucal, but rather the gun discharged when they struggled for control of the gun. He supports his contention by indicating that the bullet did not directly strike Manucal, but instead ricocheted off the wall which then hit Manucal. The court is not persuaded.

A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a constitutional claim, *Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *id.* at 324. A federal court

9

reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* to the facts of the case. *Id.* 1275 (quoting 28 U.S.C. § 2254(d)).

Here, there was sufficient evidence to prove that petitioner had an intent to kill Manucal. The Court of Appeal noted that when Manucal opened the door to the garage and saw a man wearing a mask, she tried to fight him off and shut the door, but he was too strong. He forced the door open further and pressed a gun against her neck. Although she managed to push his hand away from her neck, he fired several shots. The one that hit her in the head was likely a ricochet shot. It is not surprising that he did not hit her with a direct shot because Manucal was pushing his hand away from her neck when he pulled the trigger. That she was not hit directly is not necessarily evidence of petitioner's lack of intent to kill, but may have been due to her efforts to defend herself. At least, a reasonable jury could have so found. If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. There was sufficient evidence to support the verdict.

The state appellate courts' rejection of petitioner's claim was not contrary to, nor was it an unreasonable application of, clearly established United States Supreme Court authority.

3. Violation of due process rights from co-defendant's attorney's misconduct

Petitioner contends that his due process rights to a fair trial were violated when his co-defendant's counsel engaged in misconduct by making improper remarks during closing argument.

The U.S. Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly. *Estelle v. McGuire*, 502 U.S. 62 (1991). Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. *Id.* The issue is whether the claimed error so fatally infected the proceedings as to render them fundamentally unfair. *Jammal v. Van De Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). The acts complained of must be such as to necessarily prevent a fair trial. *Cacoperdo v. Demosthenes*, 37 F.3d 504, 509 (9th Cir. 1994).

Comment on a defendant's failure to testify -- not the issue here -- is improper when done by a prosecutor, *Griffin v. California*, 380 U.S. 609, 615 (1965), and has been held by courts of appeals also to be improper when done by the court or a co-defendant, *United States v. Patterson*, 819 F.2d 1495, 1506 (9th Cir. 1987). But there is no Supreme Court authority that comment by anyone other than a prosecutor on failure to testify is a constitutional violation, and no authority that comments of the sort at issue here, by whomever made, are a violation. As a result, these claims cannot be the basis for federal habeas relief.

Alternatively, for the reasons discussed below, the court concludes that co-defendant's counsel's remarks were harmless.

a. First claimed instance of misconduct

Petitioner contends that his co-defendant's counsel's remarks were improper when counsel characterized petitioner as a sick jerk. Ex. A at 19. Petitioner's counsel objected. The court sustained the objection and directed the jury to disregard the remark. Jurors are presumed to follow their instructions, *Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and petitioner has not rebutted the presumption. The admonition of the jury cured any

11

1 prejudice.

2 Even if the jury did not follow the trial court's admonition, petitioner was not
3 prejudiced. The potential effects of counsel characterizing petitioner as a sick jerk were
4 minimal when compared to the evidence properly admitted against petitioner. Gina Duncan
5 identified petitioner as the man in the van with Williams and Murray the night before the
6 crimes and as the person who talked about a "jack" and pulled two masks and a .38 gun
7 from a bag in the van. The following day, petitioner gave Manucal's credit card to Duncan
8 and told her to try to buy something with it. Petitioner was arrested in Manucal's car, along
9 with Murray. Petitioner also had the keys to the minivan and a rental agreement for the van
10 which was found in his name. The .22 rifle implicated in the car shooting was found in his
11 home. He made several incriminating remarks to police at the time of his arrest and
12 afterwards, and even admitted in a taped statement that he went to Manucal's house, fired
13 the .38 gun, and fled.

14 Given the strength of the case against petitioner, it is clear that Murray's counsel's
15 objectionable argument did not contribute to the verdict.

16     b. Second Claim

17 Petitioner next asserts that his co-defendant's counsel engaged in misconduct when
18 counsel discussed matters not in evidence.

19 Co-defendant's counsel argued that "[Murray] was not there. He reported his gun
20 stolen weeks before, gave it, sold it to Dotson. I can't argue[,] it's not in evidence and
21 nobody put – let's assume we know he sold it or got rid of it or Dotson had it. He's
22 responsible for that. He's – " Ex. A at 20. The prosecutor objected and the court
23 admonished Murray's counsel to confine himself to the evidence. *Id.*

24 Petitioner's counsel did not object. As a result, respondent contends that this claim
25 is procedurally barred. The Ninth Circuit has recognized and applied the California
26 contemporaneous objection rule in affirming denial of a federal petition on grounds of
27 procedural default where there was a complete failure to object at trial. *Vansickel v. White*,
28

12

166 F.3d 953, 957-58 (9th Cir. 1999). Petitioner has not attempted to avoid the default by showing cause and prejudice. As a result, this claim is procedurally barred.

In addition, although petitioner's counsel did not object and did not ask for an admonition, as a result of the prosecutor's objection an admonition was given. There was no prejudice.

### c. Third Claim

Petitioner contends that co-defendant's counsel engaged in misconduct when counsel stated, "I'll tell you something. There is a reasonable doubt that he shot Kathy Manucal. And if you want to know the difference between reasonable doubt and a bunch of smoke, his defense is what is [sic] a bunch of smoke --." Ex. A at 20. Petitioner's counsel objected. The trial court sustained the objection. *Id.*

Although no admonition was requested or given, the objection was sustained, and the comment was actually rather mild, considering the evidence against Dotson. Any constitutional error in relation to this comment was harmless.

### d. Fourth Claim

Petitioner asserts that co-defendant's counsel engaged in misconduct when counsel used Tamika Williams' statement to attempt to shift the blame to petitioner, arguing: "So she's talking about 'we.' You already know Chris is there. So she's arriving in the van. Who is she arriving with? It's we. She's arriving with him." Ex. A at 21. Petitioner's counsel objected, contending that the evidence was inadmissible against his client. *Id.* The trial court instructed the jury to disregard the last comment and admonished co-defendant's counsel to confine himself to the facts. *Id.*

Co-defendant's counsel then returned to the same line of argument: "Then the next thing that she says is well, my plan was to go home . . . "[B]ut well, I rode around Fremont in the van - did you end up stopping in Fremont anywhere? Yeah. We - We stopped well, yeah, we stopped, my plan was to go home but we stopped at some apartments." *Id.* Petitioner's counsel objected again and asked that the jury be admonished to disregard the

references to "we."  The trial court admonished the jury to disregard entirely all references just made and not consider them in their deliberations nor in their verdict.  *Id.*

For the reasons discussed in the sections above, the objection and admonition cured any constitutional error.  And, again as discussed above, the strength of the evidence against Dotson leads to the same conclusion.  There was no prejudice.

The state appellate courts' rejection of these claims was not contrary to, nor an unreasonable application of, clearly established Supreme Court authority.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.  The clerk shall close the file.

**IT IS SO ORDERED.**

DATED:  March 31, 2006.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.01\DOTSON048.RUL